IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 21-cv-0932-WJM-STV

EDWARD NELLSON,

    Plaintiff,

v.

U.S. FEDERAL BUREAU OF PRISONS,

    Defendant.

## ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

This matter is before the Court on Plaintiff Edward Nellson's Motion for a Temporary Restraining Order and Preliminary Injunction ("Motion"). (ECF No. 13.) In the Motion, Plaintiff asks that the Court order Defendant U.S. Federal Bureau of Prisons ("Defendant" or "BOP") to transfer Plaintiff, a federal inmate, "to a Care Level 4 facility, or equivalent medical facility, and that [it] be enjoined from ever placing him back into an institution inadequate for his medical needs." (*Id.* at 15.)

On April 13, 2021, the Court denied that portion of the Motion requesting a temporary restraining order and took under advisement the portion of the Motion requesting a preliminary injunction. (ECF No. 18.) For the reasons stated below, the portion of the Motion requesting a preliminary injunction is denied.

# I. BACKGROUND[1]

## A. BOP Care Level Classifications

Pursuant to the BOP's Clinical Guidance for Care Level Classifications for Medical and Mental Health Conditions or Disabilities ("Guidance"), inmates are assigned one of four care level classifications and are placed in facilities that are equipped to meet their medical needs. (ECF No. 35-1 ¶ 6.) Under the Guidance,

- Care Level 2 inmates are "stable outpatients who require clinician evaluations monthly to every 6 months"; conditions that qualify an inmate as Care Level 2 include "[m]edication-controlled . . . epilepsy";
- Care Level 3 inmates are "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications" and may also "require assistance with some activities of daily living ('ADLs') that can be accomplished by inmate companions," including "eating, urinating, defecating, bathing, and dressing/undressing"; and
- Care Level 4 inmates are those whose "functioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance."

(*Id.* ¶¶ 7–9; ECF No. 1-1 at 5.)

According to the BOP,

> [w]hen the medical providers, including the Clinical Director, Assistant Health Services Administrator, and an inmate's designated facility determine that the inmate's health care

---

[1] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof. These facts are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

> needs warrant a change in that inmate's BOP Care Level, the designated facility can make a change to the inmate's Care Level in the BOP's system. The institution then can initiate a process to determine whether the change in Care Level warrants a transfer. First, the institution must submit a Re-Designation Referral Request with the BOP's Central Office, through the Office of Medical Designations and Transportation ("OMDT"). A medical professional in the BOP's Central Office then reviews the inmate's medical record and the Re-Designation Referral Request to make a determination about whether the inmate should be transferred, or whether the inmate's medical needs can be met at his current facility, considering numerous factors including security needs. OMDT may also determine that additional testing is required before it can decide whether an inmate should be transferred to a different facility.

(ECF No. 35-1 ¶ 11.)

**B.      Plaintiff's Medical Care**

On March 28, 2016, while a prisoner located at the BOP's Oklahoma City Transfer Center, Plaintiff fell approximately six feet from the bunk bed where he was sleeping and landed onto his head. (ECF No. 13 at 3.) Plaintiff lost consciousness for several minutes and thereafter began reporting pain and dizziness. (*Id.*; ECF No. 3 at 2.) He was taken to the emergency room, received a CT scan of his brain, and was diagnosed with a mild concussion without a brain bleed. (ECF No. 35-1 at 14.) In the weeks that followed, Plaintiff represented to a BOP physician that he began to experience speech and movement issues, started to notice weakness on his right side, and became unable to stand without support. (*Id.* at 33.) He further developed a seizure disorder following his injury. (*Id.* at 17.)

In October 2017, a neurologist at West Virginia University noted that Plaintiff was "unable to stand on his own, needs assistance or walker to attempt [to] ambulate" and recommended that Plaintiff receive a spine and brain MRI. (*Id.* at 6, 25.)

3

On March 22, 2018, Plaintiff received an MRI scan of his brain and spine, which showed disk extrusions, disk herniation, and minor spinal cord compression between the C4 and C7 vertebrae. (ECF No. 35-1 at 27–28; ECF No. 3-1 at 2.) The brain MRI showed no abnormal enhancement. (ECF No. 35-1 at 6.)

In May 2019, BOP transferred Plaintiff to USP Florence, a Care Level 2 facility. (ECF No. 13 at 4–5.) On May 22, 2019, Dr. Sterett at USP Florence evaluated Plaintiff and noted the following:

> Saw WVU neurology in 2017 that diagnostically did not offer much, but requested an MRI of his head and C-spine. MRIs were conducted and there was a small paracentral disc herniation in his C-spine, but a neurosurgeon stated this would not account for his symptoms. An MRI of the brain was read as normal. He then saw a neurologist again in 8/2018 who stated his symptoms were likely consistent with CTE as well as post-traumatic vertigo.
>
> Diagnostically this case has been challenging, I think there are personal grievances that the inmate has with the BOP as well [as] his general behavior that are muddling the picture. What is clear however is that he cannot perform the ADLs that are required at USP Florence. As noted above he has a difficult time feeding himself, cannot independently get to medical and cannot use the toilet safely without assistance. For these reasons as well as to ensure the proper and necessary continuity of care we are requesting a transfer to a medical center.

(*Id.* at 33–34; ECF No. 3-5 at 2–3.) The same day, Dr. Sterett completed a Re-Designation Referral Request for OMDT, in which he represented that Plaintiff had a "difficult time feeding himself, cannot independently get to medical and cannot use the toilet safely without assistance. For these reasons as well as to ensure the proper and necessary continuity of care we are requesting a transfer to a medical center." (*Id.* at 35-1 at 58–60.)

4

On June 28, 2019, the re-designation was approved and Plaintiff was assigned a non-provisional Care Level 4, which BOP asserts is "required to submit the request to re-designate Plaintiff to a Medical Referral Center." (ECF No. 35-1 at 7; *see also* ECF No. 1-17 at 3.) Plaintiff was set to be transferred to USMCFP Springfield; however, the Medical Director of the Health Services Division cancelled the transfer on August 1, 2019 with the comment "please expedite local neurological workup." (ECF No. 1-17 at 3.) Thereafter, Plaintiff received an electroencephalogram on November 19, 2019. (*Id.*)

On June 10, 2020, OMDT denied the Re-Designation Referral Request and recommended additional testing, including a more extensive neurology consultation and MRI of the spine. (ECF No. 35-1 at 7, 36.) Thereafter, USP Florence officials scheduled additional testing, including another electroencephalogram in June 2020, a videonystagmography in August 2020, and further testing of Plaintiff's spinal cord in October 2020. (*Id.* at 7–8.)

After Plaintiff suffered a seizure on April 6, 2021, he filed this Motion on April 9, 2021. (ECF No. 13.) Plaintiff asserts that at FCP Florence, he "relies on his cellmates to change his diapers, help feed him, and shower him" and "cannot move around the facility with his wheelchair because many places are not accessible." (*Id.* at 5.) He further represents that "USP Florence regularly runs out of diapers and wipes for me," which results in him "sitting in [his] own refuse for hours at a time."[2] (ECF No. 13-1 ¶ 8.)

---

[2] Defendant disputes Plaintiff's representations regarding his ability to complete daily activities at USP Florence and the facility's supply of diapers. (ECF No. 35-3.) For example, Defendant has submitted a declaration from Plaintiff's Unit Manager stating that: there is no diaper shortage at USP Florence; he regularly observed Plaintiff eating, dressing and undressing, showering, and changing his diapers without assistance; he observed Plaintiff operating his wheelchair and moving throughout the unit without assistance; and Plaintiff is able to complete 25 hours of work per week as a unit orderly cleaning common areas and other high touch areas throughout the unit without assistance from other inmates. (*See* ECF No. 35-3.)

On April 16, 2021, BOP submitted another Re-Designation Referral Request to OMDT on Plaintiff's behalf, which included reports on the more recent testing that OMDT had advised. (ECF No. 35-1 at 9, 63–66.) On April 22, 2021, Captain Susan Beardsley, a Medical Designator at OMDT, issued a memorandum denying the request:

> We have reviewed your referral, which requested a transfer to a Medical Referral Center for the above-named inmate. Your request is denied at this time per the Chief of Health Programs, Health Services Division. It is recommended the patient undergo a formal PT functional assessment and maximize treatment (rehabilitation potential) prior to transfer to a medical center. Another request may be submitted, if clinically indicated, once the above has been accomplished.

(*Id.* at 8–9, 68.) On the same day, USP Florence's medical providers made a referral for a formal physical therapy and functional assessment as recommended by OMDT. (*Id.* at 9, 74.) Plaintiff subsequently received an outside physical therapy evaluation and a psychosocial evaluation by a BOP Clinical Psychologist. (*Id.* at 71–77; ECF No. 35-2.)

On May 14, 2021, BOP staff met to discuss Plaintiff's care level and determined that he should be designated as a Care Level 3 inmate, not a Care Level 4 inmate:

> In determining the appropriate Care Level, we considered his current diagnoses, prescribed medications, the complexity of his medical issues, and Plaintiff[']s testing over the past four weeks. Our informed medical opinion, including after reviewing the further testing completed in the last four weeks, is that Plaintiff is not appropriately designated as a Care Level 4 inmate. The physical therapy and functional assessment did not indicate that Plaintiff has limitations that prevent him from completing his ADLs independently. Nor did that assessment support that Plaintiff is so severely impaired as to require 24-hour skilled nursing care or nursing assistance, which would make a continuing

---

However, the Court does not need to resolve these factual disputes for purposes of this Motion.

> Care Level 4 designation appropriate. We instead
> determined that Plaintiff is most appropriately designated a
> Care Level 3 inmate. We based this determination on: (1)
> Plaintiff's epilepsy diagnosis and occasional seizures,
> including his recent apparent seizure episode in early-April
> 2021; (2) Plaintiff's right-side weakness confirmed in
> Plaintiff's physical therapy and functional assessment; and
> (3) the complexity of determining a diagnosis for his
> subjective complaints. Plaintiff was, therefore, assigned a
> non-provisional care level of Care Level 3 on May 17, 2021.

(ECF No. 35-1 at 10.)

BOP then filed a new Re-Designation Referral Request for the OMDT to evaluate whether Plaintiff should be transferred to a Care Level 3 facility on May 19, 2021, which remained pending as of the time of Defendant's response to the Motion. (*Id.* at 11.)

## II. LEGAL STANDARD

To obtain a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, Plaintiff, as the moving party, must establish:

> (1) [it] will suffer irreparable injury unless the injunction
> issues; (2) the threatened injury outweighs whatever
> damage the proposed injunction may cause the opposing
> party; (3) the injunction, if issued, would not be adverse to
> the public interest; and (4) there is a substantial likelihood of
> success on the merits.

*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (alterations incorporated). "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Id.* The balance of the harms and public interest factors merge when the government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

The "limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Schrier*, 427 F.3d at 1258

7

(quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). For that reason, the Tenth Circuit applies a heightened standard for "[d]isfavored preliminary injunctions," which do not

> merely preserve the parties' relative positions pending trial. Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win. To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor.

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citations and internal quotation marks omitted).

In the Motion, Plaintiff seeks an injunction requiring Defendant to transfer him to a Care Level 4 institution or equivalent. (ECF No. 13 at 1.) Because Plaintiff seeks to change the status quo, mandate action, and will receive substantially all the relief he seeks if the Motion is granted, Plaintiff seeks a disfavored injunction.[3] To succeed on his Motion, therefore, Plaintiff must meet the heightened standard for injunctive relief set forth by our Circuit in the *Free the Nipple* decision.

### III. ANALYSIS

Likelihood of success turns on the Plaintiff's underlying Eighth Amendment claim. (ECF No. 13 at 8.) The Eighth Amendment's prohibition against cruel and unusual

---

[3] In his reply, Plaintiff attempts to recast the status quo inquiry by arguing that it is Defendant who is attempting to change the status quo by "labeling him with unsupported diagnoses, reprimanding physicians who seek to aid him [ ], and arbitrarily re-classifying him as a Level 3 inmates [*sic*] (which opens the door to them transferring him to a Level 3 facility out of this Court's jurisdiction)." (ECF No. 37 at 5.) The Court is not persuaded; the fact remains that it is *Plaintiff* who is seeking an order requiring that Plaintiff be designated to a Care Level 4 facility. As such, it is *Plaintiff* who seeks to change the status quo and mandate action.

punishment encompasses deliberate indifference by prison officials to a prisoner's serious medical needs. *Howard v. Waide*, 534 F.3d 1227, 1235 (10th Cir. 2008). "Deliberate indifference" involves "a two-pronged inquiry, comprised of an objective component and a subjective component." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

### A.     Objective Component

The objective component requires a "sufficiently serious" medical need, meaning "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks omitted).

For purposes of this Motion, the Court will assume without deciding that Plaintiff has satisfied the objective component of his Eighth Amendment deliberate indifference claim.

### B.     Subjective Component

The subjective prong examines the Defendant's state of mind, asking whether "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "A negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1999). Moreover,

9

> insofar as [a plaintiff] seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, "the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct[ ]": their attitudes and conduct at the time suit is brought and persisting thereafter. An inmate seeking an injunction on the ground that there is "a contemporary violation of a nature likely to continue[ ]" must adequately plead such a violation; . . . to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future. In so doing, the inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction.

*Farmer*, 511 U.S. at 485–86 (internal citations omitted).

Here, Plaintiff argues that injunctive relief is appropriate to both prevent a substantial risk of serious injury from ripening into actual harm and to stop contemporaneous Eighth Amendment violations. (*See* ECF No. 13 at 12 (Plaintiff's "condition is rapidly deteriorating, and he needs medical treatment now"); *id.* at 13 ("Defendant's deliberate indifference in denying [Plaintiff] medically necessary treatment by placing him in an appropriate facility[ ] violates [Plaintiff's] Eighth Amendment rights").) Accordingly, Plaintiff must demonstrate a continuation of the Defendant's deliberate indifference to be entitled for injunctive relief.

In the Motion, Plaintiff does not devote meaningful argument to the subjective prong of his Eighth Amendment claim, and he does not explicitly identify any evidence which he contends demonstrates that any BOP officials knowingly disregarded a risk to Plaintiff's health and safety—that is, they were aware of facts from which an inference could be drawn that keeping Plaintiff in a Care Level 2 facility put Plaintiff at a substantial risk of serious harm, and that they actually drew and disregarded the

10

inference. Instead, Plaintiff merely states that "[i]t is beyond doubt that Defendant BOP recognizes [Plaintiff's] medical need because it classified him as the highest care level within its system." (ECF No. 13 at 8.)

Defendant responds that Plaintiff has not established the subjective prong because "[t]he BOP's authorities' attitudes and conduct over the past five weeks since the BOP received notice of Plaintiff's lawsuit show diligent attention to his medical needs and to determining the level of care those needs require." (ECF No. 35 at 17, 22.) The Court agrees here with Defendant.

To be sure, certain medical professionals within the BOP believe that Plaintiff should have been designated to a Care Level 4 facility in the past and have placed several requests to transfer Plaintiff to Care Level 3 and 4 facilities.[4] (*See infra*, Part I.B.) However, the fact that OMDT's medical coordinators denied those requests does not necessarily give rise to an Eighth Amendment violation. *See, e.g.*, *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006) (prisoners do not have an Eighth Amendment right to a particular course of treatment); *Perkins*, 165 F.3d at 811 ("a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation"); *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977) (same).

The Court finds that Plaintiff has not established at this initial, pre-discovery stage of the litigation that any *specific* officials within the BOP are currently acting with

---

[4] Plaintiff does not argue that these specific medical professionals acted with deliberate indifference. Nor does the Court see how Plaintiff could make this argument as these medical professionals filled out Re-Designation requests to transfer Plaintiff.

11

deliberate indifference to Plaintiff's medical conditions.[5]  To the contrary, the current record demonstrates that the relevant BOP decisionmakers: (1) are aware of Plaintiff's medical conditions and the ensuing dispute regarding his appropriate Care Level; (2) have ordered additional medical testing to determine Plaintiff's appropriate Care Level and to treat Plaintiff's medical conditions; and (3) have filed a new Re-Designation request after obtaining Plaintiff's most recent medical testing.[6]  This evidence weighs against any determination that Defendant is displaying a *continuing* deliberate indifference to Plaintiff's health or safety, much less a strong showing of such deliberate indifference to obtain injunctive relief.  *Cf. Self*, 439 F.3d at 1232–33 ("[W]here a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law.").

Accordingly, the Court finds that Plaintiff has failed to show a likelihood of success on the current record, and the Court need not analyze the remaining preliminary injunction requirements.

\* \* \* \*

---

[5] Because Plaintiff has sued the BOP as a whole rather than individual prison officials, Plaintiff seemingly attributes deliberate indifference to BOP *writ large*.  However, Plaintiff has pointed the Court to no authority holding that an institution can have a subjective state of mind, or that the subjective state of mind can be based on the collective knowledge of its employees. *See, e.g.*, *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) ("the subjective component requires *the prison official* to disregard the risk of harm claimed by the prisoner" (emphasis added)).

[6] In his reply, Plaintiff asserts that Defendant's evidence is "recently created, self-serving, and seeks to redefine [Plaintiff's] condition."  (ECF No. 37 at 5.)  Critically, however, Plaintiff does not dispute that he has undergone these additional medical tests.

The Court pauses to make a final observation. While Plaintiff has not established that he is entitled under the requirements of Rule 65 to injunctive relief based on the current record, a number of Plaintiff's allegations are deeply troubling. Of greatest concern for the undersigned is the fact that Plaintiff remains at USP Florence, despite the fact that *more than one BOP doctor has determined that Plaintiff should be placed at a Care Level 3 or 4 facility without delay*. Indeed, it may well be the case that after full merits discovery Defendant's potential liability in this case might be quite apparent. Today's ruling should not be read as any indication as to the Court's assessment on the ultimate merits of this case. As a consequence, the Court strongly recommends that Defendant seriously consider transferring Plaintiff to at least a Care Level 3 facility as soon as practicable.

## IV. CONCLUSION

For the reasons stated above, the Court ORDERS that the portion of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 13) that seeks a preliminary injunction is DENIED.

Dated this 25th day of June, 2021.

BY THE COURT:

William J. Martinez
United States District Judge